# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP1450-OA |

| | |
|---|---|
| COMPLETE TITLE: | Billie Johnson, Eric O'Keefe, Ed Perkins and Ronald Zahn, |

Petitioners,

Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, Rebecca Alwin, Congressman Glenn Grothman, Congressman Mike Gallagher, Congressman Bryan Steil, Congressman Tom Tiffany, Congressman Scott Fitzgerald, Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, Kathleen Qualheim, Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha,

Intervenors-Petitioners,

v.

Wisconsin Elections Commission, Marge Bostelmann in her official capacity as a member of the Wisconsin Elections Commission, Julie Glancey in her official capacity as a member of the Wisconsin Elections Commission, Ann Jacobs in her official capacity as a member of the Wisconsin Elections Commission, Dean Knudson in his official capacity as a member of the Wisconsin Elections Commission, Robert Spindell, Jr. in his official capacity as a member of the Wisconsin Elections Commission and Mark Thomsen in his official capacity as a member of the Wisconsin Elections Commission,

Respondents,

The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,

Intervenors-Respondents.

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | November 30, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |

COUNTY:

JUDGE:

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶8, 69-72, and 81, in which ZIEGLER, C.J., and ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶8, 69-72, and 81, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there were briefs filed by *Richard M. Esenberg, Anthony F. LoCoco, Lucas T. Vebber* and *Wisconsin Institute for Law & Liberty,* Milwaukee.

For the intervenors-petitioners Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson and Rebecca Alwin, briefs, including amicus briefs, were filed by *Douglas M. Poland, Jeffrey A. Mandell, Rachel E. Snyder, Richard A. Manthe, Carly Gerads* and *Stafford Rosenbaum LLP*, Madison; *Mel Barnes* and *Law Forward, Inc.*, Madison; *Mark P. Gaber* (pro hac vice), *Christopher Lamar* (pro hac vice)and *Campaign Legal Center*, Washington, D.C.; *Annabelle Harless* (pro hac vice) and *Campaign Legal Center*, Chicago.

For the intervenors-petitioners Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany and Scott Fitzgerald there were briefs, including amicus briefs, filed by *Misha Tseytlin, Kevin M. LeRoy*, and *Troutman Pepper Hamilton Sanders LLP*, Chicago.

For the intervenors-petitioners Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz and Kathleen Qualheim, there were briefs, including amicus briefs filed by

*Charles G. Curtis, Jr.* and *Perkins Coie LLP*, Madison; *Marc Erik Elias* (pro hac vice), *Aria C. Branch* (pro hac vice), *Daniel C. Osher* (pro hac vice), *Jacob D. Shelly* (pro hac vice), *Christina A. Ford* (pro hac vice), *William K. Hancock* (pro hac vice) and *Elias Law Group LLP*, Washington, D.C.

For the intervenors-petitioners Citizens Mathematicians and Scientists Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault and Somesh Jha, briefs were filed by *Michael P. May, Sarah A. Zylstra, Tanner G. Jean-Louis* and *Boardman & Clark LLP*, Madison, and *David J. Bradford* (pro hac vice) and *Jenner & Block LLP*, Chicago.

For the respondents Wisconsin Elections Commission, Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudson, Robert Spindell, Jr. and Mark Thomsen there were letter-briefs filed by *Steven C. Kilpatrick*, assistant attorney general, *Karla Z. Keckhaver*, assistant attorney general, *Thomas C. Bellavia*, assistant attorney general.

For the intervenors-respondents the Wisconsin Legislature there were briefs filed by *Kevin M. St. John* and *Bell Giftos St. John LLC*, Madison; *Jeffrey M. Harris* (pro hac vice), *Taylor A.R. Meehan* (pro hac vice), *James P. McGlone* and *Consovoy McCarthy PLLC*, Arlington, Virginia and *Adam K. Mortara* and *Lawfair LLC*, Chicago.

For the intervenor-respondent Governor Tony Evers there were briefs filed by *Joshua L. Kaul*, attorney general, *Anthony D. Russomanno*, assistant attorney general and *Brian P. Keenan*, assistant attorney general.

For the intervenor-respondent Janet Bewley, State Senate Democratic Minority Leader on behalf of the State Senate

3

Democratic Caucus there were briefs filed by *Tamara B. Packard*, *Aaron G. Dumas* and *Pines Bach LLP*, Madison.

There was an amicus brief filed by *Daniel R. Suhr*, Thiensville.

**2021 WI 87**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2021AP1450-OA

STATE OF WISCONSIN          :          IN SUPREME COURT

Billie Johnson, Eric O'Keefe, Ed Perkins and Ronald Zahn,

        Petitioners,

Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, Rebecca Alwin, Congressman Glenn Grothman, Congressman Mike Gallagher, Congressman Bryan Steil, Congressman Tom Tiffany, Congressman Scott Fitzgerald, Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, Kathleen Qualheim, Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha,

        Intervenors-Petitioners,

    v.

Wisconsin Elections Commission, Marge Bostelmann in her official capacity as a member of the Wisconsin Elections Commission, Julie Glancey in her official capacity as a member of the Wisconsin Elections Commission, Ann Jacobs in her official capacity as a member of the Wisconsin Elections Commission, Dean Knudson in his official capacity as a member of the Wisconsin Elections Commission, Robert Spindell, Jr. in his official capacity as a member of the Wisconsin Elections Commission, and Mark Thomsen in his official capacity as a member of the Wisconsin Elections Commission,

        Respondents,

**FILED**

**NOV 30, 2021**

Sheila T. Reiff
Clerk of Supreme Court

**The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,**

**Intervenors-Respondents.**

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶8, 69-72, and 81, in which ZIEGLER, C.J, and ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶8, 69-72, and 81, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. DALLET, J., filed a dissenting opinion in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

ORIGINAL ACTION. *Rights declared.*

¶1 REBECCA GRASSL BRADLEY, J. The Wisconsin Constitution requires the legislature "to apportion and district anew the members of the senate and assembly, according to the number of inhabitants" after each census conducted under the United States Constitution every ten years. Wis. Const. art. IV, § 3. In fulfilling this responsibility, the legislature draws maps reflecting the legislative districts across the state. Every census invariably reveals population changes within legislative districts, and the legislature must thereafter satisfy the constitutional requirement that each district contain approximately equal numbers of people by developing new maps, which are subject to veto by the governor. When this occurs, courts are often asked to step in and draw the

maps.

¶2    This year, the legislature drew maps, the governor vetoed them, and all parties agree the existing maps, enacted into law in 2011, are now unconstitutional because shifts in Wisconsin's population around the state have disturbed the constitutionally guaranteed equality of the people's representation in the state legislature and in the United States House of Representatives.  We have been asked to provide a remedy for that inequality.  Some parties to this action further complain that the 2011 maps reflect a partisan gerrymander favoring Republican Party candidates at the expense of Democrat Party candidates, and ask us to redraw the maps to allocate districts equally between these dominant parties, although no one asks us to assign districts to any minor parties in proportion to their share of Wisconsin's electoral vote.

¶3    The United States Supreme Court recently declared there are no legal standards by which judges may decide whether maps are politically "fair."  Rucho v. Common Cause, 139 S. Ct. 2484, 2499-500 (2019).  We agree.  The Wisconsin Constitution requires the legislature——a political body——to establish the legislative districts in this state.  Just as the laws enacted by the legislature reflect policy choices, so will the maps drawn by that political body.  Nothing in the constitution empowers this court to second-guess those policy choices, and nothing in the constitution vests this court with the power of the legislature to enact new maps.  Our role in redistricting remains a purely judicial one, which limits us to

declaring what the law is and affording the parties a remedy for its violation.

¶4 In this case, the maps drawn in 2011 were enacted by the legislature and signed into law by the governor. Their lawfulness was challenged in a federal court, which upheld them (subject to a slight adjustment to Assembly Districts 8 and 9 in order to comply with federal law). Baldus v. Members of Wis. Gov't Accountability Bd., 862 F. Supp. 2d 860, 863 (E.D. Wis. 2012). In 2021, those maps no longer comply with the constitutional requirement of an equal number of citizens in each legislative district, due to shifts in population across the state. This court will remedy that malapportionment, while ensuring the maps satisfy all other constitutional and statutory requirements. Claims of political unfairness in the maps present political questions, not legal ones. Such claims have no basis in the constitution or any other law and therefore must be resolved through the political process and not by the judiciary.

## I. PROCEDURAL HISTORY AND HOLDING

¶5 Billie Johnson et al., four Wisconsin voters ("Wisconsin voters"), filed a petition for leave to commence an original action in this court following the release of the results of the 2020 census. Claiming to live in malapportioned congressional and state legislative districts, they have asked us to declare the existing maps—codified in Chapters 3 and 4 of the Wisconsin Statutes—violate the "one person, one vote" principle embodied in Article IV, Section 3 of the Wisconsin

4

Constitution. They also have asked us to enjoin the respondents, the Wisconsin Elections Commission (WEC) and its members in their official capacity, from administering congressional and state legislative elections until the political branches adopt redistricting plans meeting the requirements of Article IV. Because the legislature and the governor reached an impasse, the Wisconsin voters request a mandatory injunction,[1] remedying what all parties agree are unconstitutional plans by making only those changes necessary for the maps to comport with the one person, one vote principle while satisfying other constitutional and statutory mandates (a "least-change" approach).

¶6 We granted the petition and permitted the legislature, the governor, and several other parties to intervene. The intervenors raised numerous issues of federal and state law. In addition to the requirements of Article IV of the Wisconsin Constitution, we have been asked to consider the following laws in shaping any judicial remedy for the malapportioned congressional and state legislative districts: (1) Article I, Section 2 of the United States Constitution; (2) the Equal Protection Clause of the Fourteenth Amendment of the United

---

[1] A "mandatory injunction" is "[a]n injunction that orders an affirmative act or mandates a specified course of conduct." Mandatory injunction, Black's Law Dictionary (11th ed. 2019). When a court orders elections be conducted pursuant to modified maps, it is effectively ordering a mandatory injunction. See Reynolds v. Sims, 377 U.S. 533, 541 (1964).

States Constitution; (3) the Voting Rights Act (VRA) of 1965;[2] and (4) multiple provisions of the Wisconsin Constitution's Declaration of Rights.

¶7 In anticipation of implementing a judicial remedy upon the expected impasse the political branches have now reached, we ordered the parties to address four issues:

(1) Under the relevant state and federal laws, what factors should we consider in evaluating or creating new maps?

(2) Is the partisan makeup of districts a valid factor for us to consider in evaluating or creating new maps?

(3) The petitioners ask us to modify existing maps using a "least-change" approach. Should we do so, and if not, what approach should we use?

(4) As we evaluate or create new maps, what litigation process should we use to determine a constitutionally sufficient map?[3]

We addressed the fourth question, at least preliminarily, in a prior order.

¶8 We hold: (1) redistricting disputes may be judicially resolved only to the extent necessary to remedy the violation of a justiciable and cognizable right protected under the United States Constitution, the VRA, or Article IV, Sections 3, 4, or 5

---

[2] One intervenor invoked the Fifteenth Amendment of the United States Constitution, but did not develop an argument distinguishable from the intervenor's VRA argument. See Hunter et al. Br. at 20, 30. Accordingly, we do not address the Fifteenth Amendment further.

[3] Johnson v. WEC, No. 2021AP1450-OA, unpublished order (Wis. Oct. 14, 2021) (per curiam) (ordering supplemental briefing).

of the Wisconsin Constitution; (2) the partisan makeup of districts does not implicate any justiciable or cognizable right; and (3) this court will confine any judicial remedy to making the minimum changes necessary in order to conform the existing congressional and state legislative redistricting plans to constitutional and statutory requirements. The existing maps were passed by the legislature and signed by the governor. They survived judicial review in federal court. Revisions are now necessary only to remedy malapportionment produced by population shifts made apparent by the decennial census. Because the judiciary lacks the lawmaking power constitutionally conferred on the legislature, we will limit our remedy to achieving compliance with the law rather than imposing policy choices.

## II.  BACKGROUND

### A.  Legal Context

¶9  Historical context helps frame the Petitioners' claims by illustrating the one person, one vote principle. The phrase "one person, one vote" is a relatively modern expression, but the concept of equal representation by population, as well as its alternatives, were familiar at the founding. In eighteenth-century England, over half of the members of the House of Commons were elected from sparsely populated districts, later branded the "rotten boroughs." Such a system of representation undermined popular sovereignty. 5 T.H.B. Oldfield, The Representative History of Great Britain and Ireland 219 (1816) ("The great Earl of Chatham called these boroughs the

7

excrescences, the rotten part of the constitution, which must be amputated to save the body from a mortification.").

¶10 In contrast, representation by population gives an area with a larger population more influence in the legislative body than an area with a smaller population. Our nation's founders enshrined this principle in Article I, Section 2 of the United States Constitution. Its third clause specifies that the House of Representatives, unlike its predecessor, the House of Commons, must be apportioned "among the several States . . . according to their respective Numbers[.]" To account for population shifts, it requires the federal government to conduct a census every ten years and then reapportion representatives. U.S. Const. art. I, § 2, cl. 3.

¶11 The Framers established a bicameral legislature. They viewed per capita representation in the House of Representatives as essential to the preservation of the people's liberty. The Federalist No. 52, at 327 (James Madison) (Clinton Rossiter ed., 1961). With respect to the Senate, the Framers enshrined the concept of state sovereignty by allocating senators equally among the states, regardless of population size. See U.S. Const. art. I, § 3, cl. 1 ("The Senate of the United States shall be composed of two Senators from each State."). Accordingly, Senate seats are unaffected by redistricting.

¶12 Redistricting involves many political choices, and the United States Constitution does not substantially constrain state legislatures' discretion to decide how congressional elections are conducted. See U.S. Const. art. I, § 4.

8

Nevertheless, redistricting must comply with the one person, one vote principle. Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964). Even if a state does not gain or lose congressional seats, redistricting is often a constitutional imperative after each census due to geographic population shifts.

¶13 Wisconsin's founders also guaranteed equal representation by population in our state constitution, which places an affirmative duty on the legislature to implement redistricting plans for the state legislature every ten years, after the federal census, to account for population shifts. Wis. Const. art. IV, § 3. No provision of the Wisconsin Constitution requires the legislature to apportion or district anew the state's congressional districts.[4] Other federal and state laws, discussed in more detail in the remainder of this opinion, place further limitations on the legislature's discretion when implementing redistricting plans.

### B. The 2020 Census

¶14 The legislature enacted the current maps in 2011. 2011 Wis. Act 44; 2011 Wis. Act 43. Wisconsin's eight congressional districts are mapped in Wis. Stat. §§ 3.11 to 3.18 (2019-20).[5] See also Wis. Stat. § 3.001 ("This state is divided into 8 congressional districts."). The state's 99 assembly

---

[4] The Petitioners agree this court has never held any provision of the Wisconsin Constitution imposes a one person, one vote requirement on congressional districts. Omnibus Am. Pet., ¶1 n.2.

[5] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

9

districts are mapped in Wis. Stat. §§ 4.01 to 4.99, although a federal district court made a slight adjustment to Assembly Districts 8 and 9 after concluding the map violated the VRA. Baldus, 862 F. Supp. 2d at 863. The state's 33 senate districts are mapped in Wis. Stat. § 4.009. See also Wis. Stat. § 4.001 ("This state is divided into 33 senate districts, each composed of 3 assembly districts.").

¶15 In August 2021, the United States Census Bureau delivered redistricting data to the State of Wisconsin based upon the 2020 census. According to census data, the population of Wisconsin grew from 5,686,986 to 5,893,718. In order to realize equal legislative representation across districts, the ideal congressional district should have 736,715 people, the ideal assembly district should have 59,533, and the ideal senate district should have 178,598. While the ideal size of each district has changed, the number of districts remains the same. Wisconsin has not lost or gained any congressional seats, and the number of assembly and senate districts is set by Wisconsin statutes. Wis. Stat. §§ 3.001, 4.001.

¶16 The Wisconsin voters and many intervenors live in malapportioned districts, meaning they live in districts that are overpopulated. For example, one Wisconsin voter, Johnson, lives in Assembly District 78, which has a population of 66,838——7,305 more than ideal. If the districts are not reapportioned, Johnson's vote will be diluted in the ensuing elections.

### C. The Impasse

¶17 On November 11, 2021, the legislature passed

10

redistricting plans. One week later, the governor vetoed the legislation. The legislature has failed to override his veto.

¶18 At this point, the political branches have reached an impasse, and our involvement in redistricting has become appropriate. See Johnson v. WEC, No. 2021AP1450-OA, unpublished order, at 2 (Wis. Sept. 22, 2021, amended Sept. 24) (per curiam) (granting the petition for leave to commence an original action) ("[J]udicial relief becomes appropriate in reapportionment cases only when a legislature fails to reapportion according to constitutional requisites in a timely fashion after having had an adequate opportunity to do so." (citation omitted)). The parties present diametrically opposed views regarding the manner in which this court should remedy what all parties agree is an unconstitutional malapportionment of congressional and state legislative districts.

¶19 Notwithstanding a history of judicial involvement in redistricting, in our constitutional order it remains the legislature's duty. State ex rel. Reynolds v. Zimmerman (Zimmerman I), 22 Wis. 2d 544, 569-70, 126 N.W.2d 551 (1964). Article IV, Section 3 of the Wisconsin Constitution commands, "[a]t its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants." "The Framers in their wisdom entrusted this decennial exercise to the legislative branch because the give-and-take of the legislative process, involving as it does representatives elected by the people to

11

make precisely these sorts of political and policy decisions, is preferable to any other." Jensen v. Wis. Elections Bd., 2002 WI 13, ¶10, 249 Wis. 2d 706, 639 N.W.2d 537 (per curiam). The political process failed this year, necessitating our involvement. As should be self-evident from this court's lack of legislative power, any remedy we may impose would be in effect only "until such time as the legislature and governor have enacted a valid legislative apportionment plan." State ex rel. Reynolds v. Zimmerman (Zimmerman II), 23 Wis. 2d 606, 606, 128 N.W.2d 16 (1964) (per curiam).

## III. OUR REVIEW

### A. Exercising Our Original Jurisdiction

¶20 We review this case under our original jurisdiction conferred by Article VII, Section 3(2) of the Wisconsin Constitution, pursuant to which "[t]he supreme court . . . may hear original actions and proceedings." Generally, we exercise our original jurisdiction when the case concerns "the sovereignty of the state, its franchises or prerogatives, or the liberties of its people." Petition of Heil, 230 Wis. 428, 436, 284 N.W. 42 (1938) (per curiam) (quoting Att'y Gen. v. Chi. & N.W. Ry., 35 Wis. 425, 518 (1874)). We granted the petition in this case because "[t]here is no question . . . that this matter warrants this court's original jurisdiction; any reapportionment or redistricting case is, by definition publici juris, implicating the sovereign rights of the people of this state." Jensen, 249 Wis. 2d 706, ¶17 (citing Heil, 230 Wis. at 443).

12

B. Principles of Interpretation

¶21 This case requires us to interpret the United States Constitution and the Wisconsin Constitution. "Issues of constitutional interpretation . . . are questions of law." James v. Heinrich, 2021 WI 58, ¶15, __ Wis. 2d __, 960 N.W.2d 350 (citation omitted). We are bound by United States Supreme Court precedent interpreting the United States Constitution. State v. Jennings, 2002 WI 44, ¶18, 252 Wis. 2d 228, 647 N.W.2d 142 (citation omitted). As the state's highest court, we are "the final arbiter of questions arising under the Wisconsin Constitution[.]" Jensen, 249 Wis. 2d 706, ¶25.

¶22 Our goal when we interpret the Wisconsin Constitution is "to give effect to the intent of the framers and of the people who adopted it[.]" State v. Cole, 2003 WI 112, ¶10, 264 Wis. 2d 520, 665 N.W.2d 328 (quotation marks and citations omitted). "[W]e focus on the language of the adopted text and historical evidence [of its meaning] including 'the practices at the time the constitution was adopted, debates over adoption of a given provision, and early legislative interpretation as evidenced by the first laws passed following the adoption.'" State v. Halverson, 2021 WI 7, ¶22, 395 Wis. 2d 385, 953 N.W.2d 847 (quoting Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶28 n.10, 393 Wis. 2d 38, 946 N.W.2d 35).

¶23 This case also requires interpretation of statutory provisions governing redistricting. "Issues of statutory

13

interpretation and application present questions of law." James, __ Wis. 2d __, ¶15 (citation omitted).

IV. DISCUSSION

A. Relevant Considerations Under Federal and State Law

1. Federal Constitutional Requirements

¶24 Both federal and state laws regulate redistricting. Article I, Section 2 of the United States Constitution requires members of the House of Representatives to be chosen "by the People of the several states." The United States Supreme Court construed this section to mean "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry, 376 U.S. at 7-8. Similarly, the United States Supreme Court held, "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Reynolds v. Sims, 377 U.S. 533, 577 (1964); see also Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 674-75 (1964) (holding even state senate districts must comply with the one person, one vote principle).

¶25 As a matter of federal constitutional law, the one person, one vote principle applies more forcefully to congressional districts than to state legislative districts. The United States Supreme Court declared: "[There is] no excuse for the failure to meet the objective of equal representation for equal numbers of people in congressional districting other than the practical impossibility of drawing equal districts with

14

mathematical precision." Mahan v. Howell, 410 U.S. 315, 322 (1973). "[P]opulation alone" is the "sole criterion of constitutionality in congressional redistricting under Art. I, § 2[.]" Id. For congressional districts, even less than a one percent difference between the population of the largest and smallest districts is constitutionally suspect. Karcher v. Dagget, 462 U.S. 725, 727 (1983). "[A]bsolute population equality" is "the paramount objective." Abrams v. Johnson, 521 U.S. 74, 98 (1997) (quoting Karcher, 462 U.S. at 732).

¶26 In contrast, the Equal Protection Clause, as applied to state legislative districts, imposes a less exacting one person, one vote principle. Mahan, 410 U.S. at 322. Consistent with principles of federalism, states have limited flexibility to pursue other legitimate policy objectives, such as "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory." Brown v. Thomson, 462 U.S. 835, 842 (1983) (quoting Reynolds, 377 U.S. at 578) (modifications in the original).

### 2. Federal Statutes

¶27 Federal statutes also govern redistricting. 2 U.S.C. § 2c prohibits multimember congressional districts. See also Wis. Stat. § 3.001 (same). The VRA prohibits the denial or abridgment of the right to vote on account of race, color, or membership in a language minority group, which implicates redistricting practices. It provides, in relevant part:

> (a) No voting qualification or prerequisite to voting
> or standard, practice, or procedure shall be imposed

or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2)[, which protects language minority groups,] of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. The "dispersal" of a minority group among several districts can render the group an "ineffective" voting bloc. Cooper v. Harris, 137 S. Ct. 1455, 1464 (2017) (quoting Thornburg v. Gingles, 478 U.S. 30, 46 n.11 (1986)). Such a result may violate the VRA, even if the map drawers lacked discriminatory intent. Thornburg, 478 U.S. at 71. All parties in this case agree we should ensure any remedy we impose satisfies the requirements of the VRA.

### 3. Wisconsin Constitutional Requirements

¶28 Via the Wisconsin Constitution, the people of Wisconsin have imposed additional requirements on redistricting. Article IV, Section 3 of the Wisconsin Constitution provides, "[a]t its first session after each enumeration made by the

16

authority of the United States," <u>i.e.</u>, the census, "the legislature shall apportion and district anew the members of the senate and assembly, <u>according to the number of inhabitants</u>." (Emphasis added.) As we stated in our seminal decision in <u>State ex rel. Attorney General v. Cunningham</u>:

> It is proper to say that <u>perfect exactness</u> in the apportionment, according to the number of inhabitants, is neither required nor possible. But there should be as close an approximation to <u>exactness</u> as possible, and this is the utmost limit for the exercise of legislative discretion.

81 Wis. 440, 484, 51 N.W. 724 (1892). Our decision in <u>Cunningham</u> comports with the provision's original meaning.

¶29 The one person, one vote principle had been "germinating" since the nation's founding——although the phrase is a twentieth-century invention. James A. Gazell, <u>One Man, One Vote: Its Long Germination</u>, 23 W. Pol. Q. 445, 462 (1970). As a delegate to the federal constitutional convention, founding father James Wilson was an outspoken advocate for equal representation by population: "[E]qual numbers of people ought to have an equal no. of representatives. . . . Representatives of different districts ought clearly to hold the same proportion to each other, as their respective constituents hold to each other." 1 <u>The Records of the Federal Convention of 1787</u> 179-80 (Max Farrand ed., 1911) (statement of James Wilson, Penn.); <u>see also</u> James Wilson, <u>Of the Constitutions of the United States and of Pennsylvania——Of the Legislative Department</u> (1790-91), <u>in</u> 2 <u>The Works of the Honourable James Wilson, L.L.D.</u>, 117, 129 (1804) ("Elections are equal, when a given number of citizens,

17

in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state.").

¶30 In choosing per capita representation for the House of Representatives, the founders rejected England's infamous rotten boroughs:

> The number of inhabitants in the two kingdoms of England and Scotland cannot be stated at less than eight million. The representatives of these eight millions in the House of Commons amount to five hundred and fifty-eight. Of this number, one ninth are elected by three hundred and sixty-four persons, and one half, by five thousand seven hundred and twenty-three persons. It cannot be supposed that the half thus elected . . . can add any thing either to the security of the people against the government, or to the knowledge of their circumstances and interests in the legislative councils.

The Federalist No. 56, at 349 (James Madison). In contrast, the equal proportion of representation prescribed by the Constitution "will render the [House of Representatives] both a safe and competent guardian of the interests which will be confined to it." Id. at 350.

¶31 The Northwest Ordinance of 1787 further evidences the founders' regard for equal representation by population. It states, in relevant part, "[t]he inhabitants of the said territory shall always be entitled to . . . a proportionate representation of the people in the legislature[.]" Northwest Ordinance § 14, art. 2 (1787). Its enactment guaranteed the equality of representation for newly admitted states.

¶32 In the first redistricting case this court decided, a

18

concurring justice referenced the Northwest Ordinance. Cunningham, 81 Wis. at 512 (Pinney, J., concurring). He explained the phrase "according to the number of inhabitants" in Article IV, Section 3 of the Wisconsin Constitution was "intended to secure in the future" a pre-existing right of the people, specifically, "'proportionate representation,' and apportionment 'as nearly equal as practicable among the several counties for the election of members' of the legislature[.]" Id.

¶33 Early legislative redistricting practices confirm this original meaning. Id. In 1851, the state's first governor, Nelson Dewey, vetoed the legislature's first redistricting plan, explaining in his veto message:

> I object to the provisions of this bill, because the apportionment in many cases, is not made upon the constitutional basis. A comparison of some of the senatorial districts with the ratio and with each other, will clearly present its unconstitutional features.

1851 Wis. Assemb. J. 810. Consistent with its federal counterpart, Article IV, Section 3 of the Wisconsin Constitution gives the legislature the duty to enact a redistricting plan after each federal census to prevent one person's vote——in an underpopulated district——from having more weight than another's in an overly populated district. Zimmerman I, 22 Wis. 2d at 564–69.

¶34 In addition to proportional representation by population, the Wisconsin Constitution establishes principles of "secondary importance" that circumscribe legislative discretion

19

when redistricting. Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630, 635 (E.D. Wis. 1982). In this case, the parties raise only malapportionment claims; no one claims the current maps violate one of these secondary principles. Nevertheless, in remedying the alleged harm, we must be mindful of these secondary principles so as not to inadvertently choose a remedy that solves one constitutional harm while creating another.

¶35 Article IV, Section 4 of the Wisconsin Constitution directs assembly districts "be bounded by county, precinct, town or ward lines[.]" Applying the one person, one vote principle may make bounding districts by county lines nearly impossible. See Wis. State AFL-CIO, F. Supp. at 635 (stating the maintenance of county lines is "incompatib[le] with population equality"); see also 58 Wis. Att'y Gen. Op. 88, 91 (1969) ("[T]he Wisconsin Constitution no longer may be considered as prohibiting assembly districts from crossing county lines, in view of the emphasis the United States Supreme Court has placed upon population equality in electoral districts."). Nonetheless, the smaller the political subdivision, the easier it may be to preserve its boundaries. See Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002) ("Although avoiding the division of counties is no longer an inviolable principle, respect for the prerogatives of the Wisconsin Constitution dictate that wards and municipalities be kept whole where possible.").

¶36 Article IV, Section 4 of the Wisconsin Constitution further commands assembly districts be "contiguous," which

20

generally means a district "cannot be made up of two or more pieces of detached territory." State ex rel. Lamb v. Cunningham, 83 Wis. 90, 148, 53 N.W. 35 (1892). If annexation by municipalities creates a municipal "island," however, the district containing detached portions of the municipality is legally contiguous even if the area around the island is part of a different district. Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992).

¶37 Article IV, Section 4 of the Wisconsin Constitution also requires assembly districts to be "in as compact form as practicable[.]" We have never adopted a particular measure of compactness, but the constitutional text furnishes some latitude in meeting this requirement. Additionally, Article IV, Section 4 prohibits multi-member assembly districts; therefore, each district may have only a single representative. Finally, Article IV, Section 5 states no assembly district can be "divided in the formation of a senate district," and senate districts must consist of "convenient contiguous territory" with each senate district served by only a single senator.

¶38 In summary, the Wisconsin Constitution "commits the state to the principle of per capita equality of representation subject only to some geographical limitations in the execution and administration of this principle." Zimmerman I, 22 Wis. 2d at 556. In determining a judicial remedy for malapportionment, we will ensure preservation of these justiciable and cognizable rights explicitly protected under the United States Constitution, the VRA, or Article IV, Sections 3,

21

4, or 5 of the Wisconsin Constitution.

### B. This Court Will Not Consider the Partisan Makeup of Districts

¶39 The simplicity of the one person, one vote principle, its textual basis in our constitution, and its long history stand in sharp contrast with claims that courts should judge maps for partisan fairness, a concept untethered to legal rights. The parties have failed to identify any judicially manageable standards by which we could determine the fairness of the partisan makeup of districts, nor have they identified a right under the Wisconsin Constitution to a particular partisan configuration. Because partisan fairness presents a purely political question, we will not consider it.

#### 1. Partisan Fairness Is a Political Question

¶40 "Sometimes, . . . 'the law is that the judicial department has no business entertaining [a] claim of unlawfulness——because the question is entrusted to one of the political branches or involves no judicially enforceable rights.'" Rucho, 139 S. Ct. at 2494 (quoting Vieth v. Jubelirer, 541 U.S. 267, 277 (2004) (plurality)). For this reason, "political questions" are non-justiciable, that is, "outside the courts' competence[.]" Id. (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). Whether a map is "fair" to the two major political parties is quintessentially a political question because: (1) there are no "judicially discoverable and manageable standards" by which to judge partisan fairness; and (2) the Wisconsin Constitution explicitly assigns the task of

22

redistricting to the legislature——a political body. See Baker, 369 U.S. at 217.

¶41 The lack of standards by which to judge partisan fairness is obvious from even a cursory review of partisan gerrymandering jurisprudence. Partisan "gerrymandering" is "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Gerrymandering, Black's Law Dictionary (11th ed. 2019). The United States Supreme Court declared partisan gerrymandering claims to be non-justiciable under the United States Constitution, and the very existence of such claims is doubtful. Rucho, 139 S. Ct. 2484; Vieth, 541 U.S. 267. See generally Daniel H. Lowenstein, Vieth's Gap: Has the Supreme Court Gone from Bad to Worse on Partisan Gerrymandering, 14 Cornell J.L. & Pub. Pol'y 367 (2005). Writing for the Court in Rucho v. Common Cause, Chief Justice Roberts noted at the outset the Court has never struck down a map as an unconstitutional partisan gerrymander and acknowledged that several decades of searching for a judicially manageable standard by which to judge maps' partisan fairness had been in vain. 139 S. Ct. at 2491.

¶42 "Partisan gerrymandering claims invariably sound in a desire for 'proportional representation.'" Id. at 2499. Advocated by several parties in this case, proportional representation is the political theory that a party should win a percentage of seats, on a statewide basis, that is roughly equal to the percentage of votes it receives. See Proportional

23

representation, Black's Law Dictionary. This theory has no grounding in American or Wisconsin law or history, and it directly conflicts with traditional redistricting criteria. Davis v. Bandemer, 478 U.S. 109, 145 (1986) (O'Connor, J., concurring in judgment), abrogated on other grounds by Rucho, 139 S. Ct. 2484. "It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support." Rucho, 139 S. Ct. at 2501.

¶43 To begin with, measuring a state's partisan divide is difficult. Wisconsin does not have party registration, so voters never formally disclose their party membership at any point in the electoral process. Democratic Party v. Wisconsin, 450 U.S. 107, 110-11 (1981). According to one recent survey, more than one-third of Wisconsinites self-identify as independents, affiliating themselves with no party at all. Marquette Law School Poll (Aug. 3-8, 2021), https://law.marquette.edu/poll/wp-content/uploads/2021/10/MLSP66Toplines.html.

¶44 Even if a state's partisan divide could be accurately ascertained, what constitutes a "fair" map poses an entirely subjective question with no governing standards grounded in law. "Deciding among . . . different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernable in the Constitution for making such

24

judgements[.]"   Rucho, 139 S. Ct. at 2500.   Nor does the Wisconsin Constitution provide any such standards.

¶45 The people have never consented to the Wisconsin judiciary deciding what constitutes a "fair" partisan divide; seizing such power would encroach on the constitutional prerogatives of the political branches.  Vieth, 541 U.S. at 291. In contrast to legislative or executive action, "'judicial action must be governed by standard, by rule,' and must be 'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws."   Rucho, 139 S. Ct. at 2507 (quoting Vieth, 541 U.S. at 278-79).   Nothing in the Wisconsin Constitution authorizes this court to recast itself as a redistricting commission in order "to make [its] own political judgment about how much representation particular political parties deserve——based on the votes of their supporters——and to rearrange the challenged districts to achieve that end."  Id. at 2499.

¶ 46 Nothing in the United States Constitution or the Wisconsin Constitution commands "that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers[.]"   Vieth, 541 U.S. at 288; see also id. at 308 (Kennedy, J., concurring in judgment) (stating there is "no authority" for the notion that a Democrat majority of voters in Pennsylvania should be able to elect a Democrat majority of Pennsylvania's congressional delegation); Nathaniel Persily, In Defense of Foxes Guarding Henhouses:  The Case for Judicial

Acquiescence to Incumbent-Protecting Gerrymanders, 116 Harv. L. Rev. 649, 672-73 (2002) ("So long as the state's majority has its advocate in the executive, is it necessarily true that the state's majority should control the legislature as well?").

¶47 Not only is a right to proportional party representation nonexistent in either constitution but the theory conflicts with principles that are constitutionally protected. The theory is irreconcilable with the requirement that congressional and state legislative districts be single-member districts. See 2 U.S.C. § 2c; Wis. Const. art. IV, §§ 4-5. For state legislative districts, the theory is particularly ill suited because Article IV of the Wisconsin Constitution specifies requirements that favor the preservation of communities of interest, irrespective of individual partisan alignment. See Wis. Const. art. IV, §§ 4-5 (explaining state assembly districts must be compact, contiguous, and respect political boundary lines and state senate districts must be contiguous and not divide assembly districts in their formation); Prosser, 793 F. Supp. at 863 (stating there is a "correlation between geographical propinquity and community of interest, and therefore compactness and contiguity are desirable features in a redistricting plan").

¶48 A proportional party representation requirement would effectively force the two dominant parties to create a "bipartisan" gerrymander to ensure the "right" outcome——obliterating many traditional redistricting criteria mandated by federal law and Article IV of the Wisconsin Constitution. See 2

26

U.S.C. § 2c; Wis. Const. art. IV, §§ 4-5. Democrats tend to live close together in urban areas, whereas Republicans tend to disperse into suburban and rural areas. See Baumgart, 2002 WL 34127471, at *6 ("Wisconsin Democrats tend to be found in high concentrations in certain areas[.]"). As a result, drawing contiguous and compact single-member districts of approximately equal population often leads to grouping large numbers of Democrats in a few districts and dispersing rural Republicans among several. These requirements tend to preserve communities of interest, but the resulting districts may not be politically competitive——at least if the competition is defined as an inter- rather than intra-party contest. Davis, 478 U.S. at 159; see also Larry Alexander & Saikrishna B. Prakash, Tempest in an Empty Teapot: Why the Constitution Does Not Regulate Gerrymandering, 50 Wm. & Mary L. Rev. 1, 42 n.117 (2008) (explaining "competitive primaries" often produce "responsiveness, accountability, and 'ritual cleansing'"). Democrats in urban cities may win by large margins, thereby skewing the proportion of Democrat votes statewide relative to the proportion of Democrat victories.

¶49 Perhaps the easiest way to see the flaw in proportional party representation is to consider third party candidates. Constitutional law does not privilege the "major" parties; if Democrats and Republicans are entitled to proportional representation, so are numerous minor parties. If Libertarian Party candidates receive approximately five percent of the statewide vote, they will likely lose every election; no

27

one deems this result unconstitutional. The populace that voted for Libertarians is scattered throughout the state, thereby depriving them of any real voting power as a bloc, regardless of how lines are drawn. See Robert Redwine, Comment, Constitutional Law: Racial and Political Gerrymandering——Different Problems Require Different Solutions, 51 Okla. L. Rev. 373, 396–97 (1998). Only meandering lines, which could be considered a gerrymander in their own right, could give the Libertarians (or any other minor party) a chance. Proportional partisan representation would require assigning each third party a "fair" share of representatives (while denying independents any allocation whatsoever), but doing so would in turn require ignoring redistricting principles explicitly codified in the Wisconsin Constitution.

¶50 To sacrifice textually grounded requirements designed to safeguard communities of interest in favor of proportional representation between dominant political parties mandated nowhere in the constitution would ignore not only the text but its history. "The roots of Anglo-American political representation lie in the representation of communities[.]" James A. Gardner, One Person, One Vote and the Possibility of Political Community, 80 N.C. L. Rev. 1237, 1243 (2002). "The idea that the political interests of communal groups of individuals correlated strongly with territory served, for example, as an axiom in Madison's famous defense of the large republic in The Federalist No. 10." James A. Gardner, Foreword, Representation Without Party: Lessons from State Constitutional

28

Attempts to Control Gerrymandering, 37 Rutgers L.J. 881, 935 (2006). Proportional party representation is simply incompatible with the constitutionally prescribed form of representative government chosen by the people of Wisconsin.

¶51 The Wisconsin Constitution's "textually demonstrable constitutional commitment" to confer the duty of redistricting on the state legislature evidences the non-justiciability of partisan gerrymandering claims. Baker, 369 U.S. at 217. Article IV, Section 3 of the Wisconsin Constitution unequivocally assigns the task of redistricting to the legislature, leaving no basis for claiming that partisanship in redistricting raises constitutional concerns. "[P]artisan intent is not illegal, but is simply the consequence of assigning the task of redistricting to the political branches of government." Whitford v. Gill, 218 F. Supp. 3d 837, 939 (W.D. Wis. 2016) (Griesbach, J., dissenting), rev'd sub nom., Gill v. Whitford, 138 S. Ct. 1916 (2018). "[P]oliticians pass many statutes with an eye toward securing their elections and giving their party a leg up on the competition. Gerrymandered districts are no different in kind." Alexander & Prakash, Tempest in an Empty Teapot, at 7.

¶52 The Wisconsin Constitution, like its federal counterpart, "clearly contemplates districting by political entities, . . . and unsurprisingly . . . [districting] turns out to be root-and-branch a matter of politics." Vieth, 541 U.S. at 285 (citations omitted). For the same reasons cited by the United States Supreme Court, we "have no license to reallocate

29

political power between the two major political parties," because "no legal standards [exist] to limit and direct [our] decisions." Rucho, 139 S. Ct. at 2507. The Wisconsin Constitution contains "no plausible grant of authority" to the judiciary to determine whether maps are fair to the major parties and the task of redistricting is expressly assigned to the legislature. Id. Adjudicating claims of "too much" partisanship in the redistricting process would recast this court as a policymaking body rather than a law-declaring one.

### 2. The Wisconsin Constitution Says Nothing About Partisan Gerrymandering

¶53 The United States Supreme Court has been unable to identify "what it is in the Constitution that . . . might be offended by partisan gerrymandering." Lowenstein, Vieth's Gap, at 369. We are told if we look hard enough, we will find a right to partisan fairness in Article I, Sections 1, 3, 4, or 22 of the Wisconsin Constitution. Having searched in earnest, we conclude the right does not exist. As the United States Supreme Court explained when it considered a partisan gerrymandering challenge to Wisconsin's current state legislative maps, courts are "not responsible for vindicating generalized partisan preferences." Gill, 138 S. Ct. at 1933.

¶54 The first section in the Wisconsin Constitution's Declaration of Rights states: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers

30

from the consent of the governed." Wis. Const. art. I, § 1. This section enshrines a first principle of our nation's founding: "[T]he only source of political power is in the people; . . . they are sovereign, that is to say, the aggregate community, the accumulated will of the people, is sovereign[.]" Cunningham, 81 Wis. at 497.

¶55 Article I, Section 1 of the Wisconsin Constitution has nothing to say about partisan gerrymanders. "The idea that partisan gerrymandering undermines popular sovereignty because the legislature rather than the people selects representatives is rhetorical hyperbole masked as constitutional argument. When legislatures draw districts, they in no way select who will occupy the resulting seats." Alexander & Prakash, Tempest in an Empty Teapot, at 43. Voters retain their freedom to choose among candidates irrespective of how district lines are drawn. Id.

¶56 Contriving a partisan gerrymandering claim from the text of the Wisconsin Constitution (aside from overstepping our judicial role) would require us to indulge a fiction——that partisan affiliation is permanent and invariably dictates how a voter casts every ballot. Of course, political affiliation "is not an immutable characteristic, but may shift from one election to the next[.]" Vieth, 541 U.S. at 287. "[V]oters can——and often do——move from one party to the other[.]" Davis, 478 U.S. at 156. Not only is political affiliation changeable, but self-identified partisans can——and do——vote for a different party's candidates.

31

¶57 If the constitution were misinterpreted to make changeable characteristics relevant factors in evaluating redistricting plans, "we fail to see why it demands only a partisan political mix." Alexander & Prakash, Tempest in an Empty Teapot, at 21. "[W]hy would a Constitution that never mentions political parties, much less Republicans[] [and] Democrats . . . grant special status to partisan identity?" Id. If we opened the floodgates, what would stop claims seeking proportional representation for "gun owners" or "vegetarians"? Id. Nothing distinguishes partisan affiliation from hundreds——perhaps thousands——of other variables. Id. at 22. Dispositively, none of these factors are mentioned in the text of the constitution.

¶58 Nothing supports the notion that Article I, Section 1 of the Wisconsin Constitution was originally understood——or has ever been interpreted——to regulate partisanship in redistricting. After discussing the concept of popular sovereignty in Cunningham, Justice Pinney declared: "The rules of apportionment and the restrictions upon the power of the legislature are very simple and brief." 81 Wis. at 511. He then proceeded to discuss only those requirements found in Article IV of the Wisconsin Constitution. Id. Regulation of partisanship is not among them.

¶59 Likewise, Article I, Sections 3 and 4 of the Wisconsin Constitution do not inform redistricting challenges. These sections state:

32

Section 3.  Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press.  In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Section 4.  The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged.

Collectively, these sections protect four related freedoms: (1) freedom of speech; (2) freedom of the press; (3) freedom of assembly; and (4) freedom of petition.  The First Amendment of the United States Constitution also secures these rights.

¶60 Nothing about the shape of a district infringes anyone's ability to speak, publish, assemble, or petition.  Even after the most severe partisan gerrymanders, citizens remain free to "run for office, express their political views, endorse and campaign for their favorite candidates, vote, and otherwise influence the political process through their expression." Radogno v. Ill. State Bd. of Elections, No. 11-CV-04884, 2011 WL 5025251 at *7 (N.D. Ill. Oct. 21, 2011) (quoted source omitted).

¶61 Parties urging us to consider partisan fairness appear to desire districts drawn in a manner ensuring their political speech will find a receptive audience; however, nothing in either constitution gives rise to such a claim.  "The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and

33

present one's views to the electorate do not also include entitlement to success in those endeavors. The carefully guarded right to expression does not carry with it any right to be listened to, believed or supported in one's views." Washington v. Finlay, 664 F.2d 913, 927-28 (4th Cir. 1981). Associational rights guarantee the freedom to participate in the political process; they do not guarantee a favorable outcome. See Badham v. Eu, 694 F. Supp. 664, 675 (N.D. Cal. 1988). As the United States Supreme Court has explained, "[n]one of our cases establishes an individual's right to have a 'fair shot' at winning[.]" New York State Bd. of Elections V. Torres, 552 U.S. 196, 205 (2008). Nor does the constitution.

¶62 Article I, Section 22 of the Wisconsin Constitution provides: "[t]he blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles." Wis. Const. art. I, § 22. To fabricate a legal standard of partisan "fairness"——§ 22 does not supply one——would represent anything but "moderation" or "temperance[.]" Whatever operative effect Section 22 may have, it cannot constitute an open invitation to the judiciary to rewrite duly enacted law by imposing our subjective policy preferences in the name of "justice[.]"

¶63 Unlike the Declaration of Rights, Article IV, Sections 3, 4, and 5 of the Wisconsin Constitution express a series of discrete requirements governing redistricting. These are the only Wisconsin constitutional limits we have ever

34

recognized on the legislature's discretion to redistrict. The last time we implemented a judicial remedy for an unconstitutional redistricting plan, we acknowledged Article IV as the exclusive repository of state constitutional limits on redistricting:

> [T]he Wisconsin constitution itself provides a standard of reapportionment 'meet for judicial judgment.' The legislature shall reapportion 'according to the number of inhabitants' subject to some geographical and political unit limitations in execution of this standard. We need not descend into the 'thicket' to fashion standards whole-cloth.

Zimmerman I, 22 Wis. 2d at 562 (emphasis added) (quoted sources omitted). In other words, the standards under the Wisconsin Constitution that govern redistricting are delineated in Article IV. To construe Article I, Sections 1, 3, 4, or 22 as a reservoir of additional requirements would violate axiomatic principles of interpretation, see James, __ Wis. 2d __, ¶¶21-22, while plunging this court into the political thicket lurking beyond its constitutional boundaries. Zimmerman I, 22 Wis. 2d at 562.

C.  We Will Utilize a "Least-Change" Approach

¶64 The constitutional confines of our judicial authority must guide our exercise of power in affording the Petitioners a remedy for their claims. The existing maps were adopted by the legislature, signed by the governor, and survived judicial review by the federal courts. See Gill, 138 S. Ct. 1916; Baldus, 862 F. Supp. 2d 860. Treading further than necessary to remedy their current legal deficiencies, as many parties urge us

35

to do, would intrude upon the constitutional prerogatives of the political branches and unsettle the constitutional allocation of power.

¶65 For the paramount purpose of preserving liberty, the Wisconsin Constitution embodies a structural separation of powers among the three branches of government, restraining this court from exercising anything but judicial power. "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the separation of powers. The Federalist No. 47, at 301 (James Madison); see also The Federalist No. 51, at 321–22 (James Madison) ("[The] separate and distinct exercise of the different powers of government . . . is admitted on all hands to be essential to the preservation of liberty."). "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." Morrison v. Olson, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting).

¶66 This court's precedent declares that the legislature's enactment of a redistricting plan is subject to presentment and a gubernatorial veto. Zimmerman I, 22 Wis. 2d at 559. If the legislature and the governor reach an impasse, the judiciary has a duty to remedy the constitutional defects in the existing plan. See Zimmerman II, 23 Wis. 2d 606 (implementing a judicially-created plan). But a duty to remedy a constitutional deficiency is not a prerogative to make law. See Cunningham, 81 Wis. at 482-83 (majority opinion) (describing the lawmaking

36

prerogative).

¶67 While courts sometimes declare statutes unconstitutional and may enjoin their enforcement, typically the judiciary does not order government officials to enforce a modified, constitutional version of the statute. See generally Gimbel Bros. v. Milwaukee Boston Store, 161 Wis. 489, 496, 154 N.W. 998 (1915) (citing 1 James High, A Treatise on the Law of Injunctions § 2 (edition and year not specified in the citation)) ("While the power to issue mandatory injunctions is vested in courts of equity, it is a power which is sparingly used."). Courts issue mandatory injunctions, an equitable remedy, "with extreme caution" and "only in cases of equitable cognizance[.]" 1 James High, A Treatise on the Law of Injunctions § 2 (4th ed. 1905) (emphasis added).

¶68 Redistricting litigation presents a unique problem. Unlike the constitutional monarchies of old England, which could exist in the absence of Parliament, our republican form of government presupposes the existence of a legislature. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government[.]"). If the legislature and the governor reach an impasse, merely declaring the maps unconstitutional and enjoining elections pursuant to them creates an intractable impediment to conducting elections, imperiling our republican form of government. Judicial action becomes appropriate to prevent a constitutional crisis. But we must "limit the solution to the problem." See Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320,

37

328 (2006).

¶69 Court involvement in redistricting, as in any other case, is judicial in nature. In Jensen v. Wisconsin Elections Board, we stated: "Courts called upon to perform redistricting are, of course, judicially legislating, that is, writing the law rather than interpreting it, which is not their usual——and usually not their proper——role." 249 Wis. 2d 706, ¶10. With few exceptions confined to the judicial sphere——none of which are relevant to this case——we have no power to "judicially legislate."[6] "Safeguarding constitutional limitations on the exercise of legislative power is particularly important in light of its awesome sweep." Fabick v. Evers, 2021 WI 28, ¶55, 396 Wis. 2d 231, 956 N.W.2d 856 (Rebecca Grassl Bradley, J., concurring). The people vested the power in the legislature—— not the executive and certainly not the judiciary. Id. "Because the people gave the legislature its power to make laws, the legislature alone must exercise it." Id., ¶56.

¶70 "From the very nature of things, the judicial power cannot legislate nor supervise the making of laws." League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 929 N.W.2d 209 (quoting State ex rel. Rose v. Sup. Ct. of Milwaukee Cnty., 105 Wis. 651, 675, 81 N.W. 1046 (1900)). By design, the judicial power has long been kept distinct from the

---

[6] We have limited legislative power to regulate certain subject matter related to the court system. See, e.g., Rao v. WMA Sec., Inc., 2008 WI 73, ¶35, 310 Wis. 2d 623, 752 N.W.2d 220.

legislative power.  See Neil Gorsuch, A Republic, If You Can Keep It 52-53 (Forum Trade Paperback ed., 2020) (2019) ("To the founders, the legislative and judicial powers were distinct by nature and their separation was among the most important liberty-protecting devices of the constitutional design, an independent right of the people essential to the preservation of all other rights later enumerated in the Bill of Rights.").

¶71  We have the power to provide a judicial remedy but not to legislate.  We have no authority to act as a "super-legislature" by inserting ourselves into the actual lawmaking function.  Flynn v. Dep't of Admin., 216 Wis. 2d 521, 528-29, 576 N.W.2d 245 (1998) ("If we are to maintain the public's confidence in the integrity and independence of the judiciary, we must exercise that power with great restraint, always resting on constitutional principles, not judicial will.  We may differ with the legislature's choices, as we did and do here, but must never rest our decision on that basis lest we become no more than a super-legislature.").  Courts "lack the authority to make the political decisions that the Legislature and the Governor can make through their enactment of redistricting legislation[.]"  Hippert v. Ritchie, 813 N.W.2d 374, 380 (Minn. Spec. Redistricting Panel 2012) (citing LaComb v. Growe, 541 F. Supp. 145, 151 (D. Minn. 1982), aff'd sub nom. Orwoll v. LaComb, 456 U.S. 966).  Stated otherwise, "[o]ur only guideposts are the strict legal requirements."[7]  In re Legislative

---

[7] The judiciary lacks the institutional competency to make the kind of factual determinations necessary to properly

39

_Districting of the State_, 805 A.2d 292, 298 (Md. 2002) (emphasis added).

¶72 Because our power to issue a mandatory injunction does not encompass rewriting duly enacted law, our judicial remedy "should reflect the least change" necessary for the maps to comport with relevant legal requirements. See _Wright v. City of Albany_, 306 F. Supp. 2d 1228, 1237 (M.D. Ga. 2003) (citations omitted). Using the existing maps "as a template" and implementing only those remedies necessary to resolve constitutional or statutory deficiencies confines our role to its proper adjudicative function, ensuring we fulfill our role as apolitical and neutral arbiters of the law.[8] See _Baumgart_,

---

consider various extra-legal factors. _In re Legislative Districting of the State_, 805 A.2d 292, 298 (Md. 2002) ("When the Court drafts the plan, it may not take into account the same political considerations as the Governor and the Legislature. Judges are forbidden to be partisan politicians. Nor can the Court stretch the constitutional criteria in order to give effect to broader political judgments, such as . . . the preservation of communities of interest. More basic, it is not for the Court to define what a community of interest is and where its boundaries are, and it is not for the Court to determine which regions deserve special consideration and which do not. . . . Our instruction to the consultants was to prepare for our consideration a redistricting plan that conformed to federal constitutional requirements, the Federal Voting Rights Act, and the requirements of Article III, § 4 of the Maryland Constitution.").

[8] The legislature asks us to use the maps it passed during this redistricting cycle as a starting point, characterizing them as an expression of "the policies and preferences of the State[.]" Legislature Br. at 16 (quoting _White v. Weiser_, 412 U.S. 783, 795 (1973)). The legislature's argument fails because the recent legislation did not survive the political process. The existing plans are codified as statutes, without a sunset provision, and have not been supplanted by new law.

40

2002 WL 34127471, at *7 ("The court undertook its redistricting endeavor in the most neutral way it could conceive——by taking the 1992 reapportionment plan as a template and adjusting it for population deviations."); see also Robert H. Bork, The Tempting of America:  The Political Seduction of the Law 88-89 (First Touchstone ed. 1991) (1990) (describing how Robert H. Bork, as special master in a redistricting case, drew lines without any consideration of the partisan effect of his remedy).  A least-change approach is nothing more than a convenient way to describe the judiciary's properly limited role in redistricting.

¶73 The least-change approach is far from a novel idea; many courts call it the "minimum change doctrine," reflecting its general acceptance among reasonable jurists.  It was applied in numerous cases during the last two redistricting cycles. See, e.g., Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration, 892 F. Supp. 2d 1333, 1345 (N.D. Ga. 2012) ("In preparing the draft map, the Court began with the existing map drawn by Judge Carnes in 2002.  The Court followed the doctrine of minimum change[.]"); Martin v. Augusta-Richmond Cnty., Ga., Comm'n, No. CV 112-058, 2012 WL 2339499, at *3 (S.D. Ga. June 19, 2012) ("Essentially, the Court is required to change only the faulty portions of the benchmark plan, as subtly as possible, in order to make the new plan constitutional.  Keeping the minimum change doctrine in mind, the Court only made changes it deemed necessary to guarantee substantial equality and to honor traditional redistricting concerns." (Internal citation omitted)); Stenger v. Kellet, No. 4:11-cv-2230, 2012 WL 601017,

at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts. This is called the 'least change' or 'minimal change' method . . . . The 'least change' method is advantageous because it maintains the continuity of representation for each district and is by far the simplest way to reapportion[.]"); Below v. Gardner, 963 A.2d 785, 794 (N.H. 2002) ("[W]e use as our benchmark the existing senate districts because the senate districting plan enacted in 1992 is the last validly enacted plan and is the clearest expression of the legislature's intent." (Quotation marks and quoted source omitted)); Alexander v. Taylor, 51 P.3d 1204, 1211 (Okla. 2002) ("A court, as a general rule, should be guided by the legislative policies underlying the existing plan. The starting point for analysis, therefore, is the 1991 Plan."); Bodker v. Taylor, No. 1:02-cv-999, 2002 WL 32587312, at *5 (N.D. Ga. June 5, 2002) ("The court notes . . . that its plan represents only a small, though constitutionally necessary, change in the district lines in accordance with the minimum change doctrine."); Markham v. Fulton Cnty. Bd. of Registrations & Elections, No. 1:02-cv-1111, 2002 WL 32587313, at *6 (N.D. Ga. May 29, 2002) ("Keeping the minimum change doctrine in mind, the Court made only the changes it deemed necessary to guarantee substantial equality and to honor traditional redistricting concerns.").

¶74 In declaring this court's role in resolving redistricting cases, we are mindful that "Wisconsin adheres to

42

the concept of a nonpartisan judiciary." SCR 60.06(2)(a). "In the debate over the Wisconsin Constitution, objections to an elected judiciary had centered upon the dangers of partisanship. The debate was resolved with the mandate that elections for state courts be distinctly non-partisan in character." Ellen Langill, Levi Hubbell and the Wisconsin Judiciary: A Dilemma in Legal Ethics and Non-Partisan Judicial Elections, 81 Marq. L. Rev. 985, 985 (1998). The Wisconsin Constitution discourages judicial partisanship. Wis. Const. art. IV, § 9 ("There shall be no election for a justice or judge at the partisan general election for state or county officer, nor within 30 days either before or after such election."). Similarly, the Judicial Code of Conduct prohibits judges from "be[ing] swayed by partisan interests[.]" SCR 60.04(1)(b).

¶75 To dive into the deepest of "political thicket[s],"[9] as redistricting has been described, with the intention of doing anything more than securing legal rights would be profoundly incompatible with Wisconsin's commitment to a nonpartisan judiciary. If a simple majority of this court opted to draw maps from scratch, thereby fundamentally altering Wisconsin's political landscape for years, it would significantly "increase the political pressures on this court in a partisan way that is

---

[9] Colegrove v. Green, 328 U.S. 549, 556 (1946) (plurality), abrogation recognized by Evenwel v. Abbott, 577 U.S. 937 (2016) ("Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress.").

43

totally inconsistent with our jobs as [a] nonpartisan judiciary." Wisconsin Supreme Court Open Administrative Conference (Open Administrative Conference), at 33:36 (Jan. 22, 2009) (statements of Roggensack, J.), https://wiseye.org/2009/01/22/supreme-court-open-administrative-conference-3/.

¶76 Many intervenors have argued the 2011 maps entrenched a Republican Party advantage, so using them as a starting point perpetuates a partisan gerrymander. In other words, these intervenors argue we must tip the partisan balance to benefit one party in order to avoid accusations of partisanship. We reject this demand to "[s]imply undo[] the work of one political party for the benefit of another[.]" Henderson v. Perry, 399 F. Supp. 2d 756, 768 (E.D. Tex. 2005), rev'd in part on other grounds sub nom., League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 420 (2006) (plurality). Endeavoring to rebalance the allocation of districts between the two major parties would be a decidedly nonjudicial exercise of partisanship by the court. Instead, we adopt a neutral standard. While the application of neutral standards inevitably benefits one side or the other in any case, it does not place our thumb on any partisan scale, as some intervenors urge us to do.

¶77 "Putting courts into politics, and compelling judges to become politicians, in many jurisdictions has almost destroyed the traditional respect for the Bench." Roscoe Pound, The Causes of Popular Dissatisfaction with the Administration of Justice (1906), as reprinted in Roscoe Pound Kindles the Spark

44

of Reform, 57 A.B.A. J. 348, 351 (1971). A least-change approach safeguards the long-term institutional legitimacy of this court by removing us from the political fray and ensuring we act as judges rather than political actors.

¶78 The judiciary has been repeatedly subject to "purely political attacks" by people who "did not get the result from the court . . . [they] wanted." Patience Drake Roggensack, Tough Talk and the Institutional Legitimacy of Our Courts, Hallows Lecture (Mar. 7, 2017), in Marq. Law., Fall 2017, at 45, 46. These often partisan onslaughts threaten the "[i]nstitutional legitimacy" of the judiciary, which, in turn, threatens the "rule of law" itself. Id. By utilizing the least-change approach, we do not endorse the policy choices of the political branches; rather, we simply remedy the malapportionment claims. Attempting to redress the criticisms of the current maps advanced by multiple intervenors would amount to a judicial replacement of the law enacted by the people's elected representatives with the policy preferences of unelected interest groups, an act totally inconsistent with our republican form of democracy.

¶79 We close by addressing Article IV, Section 3 of the Wisconsin Constitution, which says, in each redistricting cycle, "the legislature shall apportion and district anew[.]" (Emphasis added.) Focusing on the word "anew," an intervenor and an amicus curiae argue the court must make maps from

45

scratch.[10]  Although the proponents of this interpretation attempt to ground their argument in the provision's text, they miss the forest for the trees.  Read as a whole, the provision means the legislature must implement a redistricting plan each cycle and the language cannot reasonably be read to require the court to make maps at all, let alone from scratch.

## V.  CONCLUSION

¶80 This case illustrates the extraordinary danger of asking the judiciary to exercise "FORCE" and "WILL" instead of legal "judgment."  The Federalist No. 78, at 465 (Alexander Hamilton).  Manufacturing a standard of political "fairness" by which to draw legislative maps in accordance with the subjective preferences of judges would refashion this court as a committee of oligarchs with political power superior to both the legislature and the governor.  See In re Review of the Code of Judicial Ethics, SCR Chapter 60, 169 Wis. 2d xv, xxv (1992) (Day, J., concurring, joined by a majority) ("Tyranny need not be dressed in a military uniform, it can also wear a black robe!").  Judges must refuse to become "philosopher kings empowered to 'fix' things according to the dictates of what we fancy is our superior insight[.]"  Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 707 (6th Cir. 2016) (Batchelder, J., concurring in part).

¶81 In this case, we will implement judicial remedies only to the extent necessary to remedy the violation of a justiciable

---

[10] BLOC Br. at 31–36; Whitford Amicus Br. at 5–6.

46

and cognizable right found in the United States Constitution, the VRA, or Article IV, Sections 3, 4, or 5 of the Wisconsin Constitution. We will not consider the partisan makeup of districts because it does not implicate any justiciable or cognizable right. We adopt the least-change approach to remedying any constitutional or statutory infirmities in the existing maps because the constitution precludes the judiciary from interfering with the lawful policy choices of the legislature.

*By the court*.——Rights declared.

¶82 BRIAN HAGEDORN, J. *(concurring)*. To the extent feasible, a court's role in redistricting should be modest and restrained. We are not the branch of government assigned the constitutional responsibility to "apportion and district anew" after each decennial census; the legislature is.[1] The job of the judiciary is to decide cases based on the law.[2] Here, the laws passed in 2011 establishing legislative and congressional districts cannot govern future elections as written due to population shifts. Accordingly, our role is appropriately limited to altering current district boundaries only as needed to comply with legal requirements.[3] The majority opinion so concludes, and I join it in almost all respects.[4]

---

[1] Wis. Const. art. IV, § 3; Jensen v. Wis. Elections Bd., 2002 WI 13, ¶6, 249 Wis. 2d 706, 639 N.W.2d 537.

[2] Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶1, 393 Wis. 2d 38, 946 N.W.2d 35.

[3] Upham v. Seamon, 456 U.S. 37, 43 (1982) ("Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of 'reconciling the requirements of the Constitution with the goals of state political policy.' An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." (citation omitted)); White v. Weiser, 412 U.S. 783, 795 (1973) ("In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" (quoting another source)).

[4] I concur in the majority's conclusions that: (1) remedial maps must comply with the United States Constitution; the Voting Rights Act; and Article IV, Sections 3, 4, and 5 of the Wisconsin Constitution; (2) we should not consider the partisan makeup of districts; and (3) our relief should modify existing maps under a least-change approach. I join the entirety of the majority opinion except ¶¶8, 69-72, and 81. The paragraphs I do

1

¶83 Where the political process has failed and modified maps are needed before the next election, the court's function is to formulate a remedy——one tailored toward fixing the legal deficiencies.[5] The majority opinion asserts that only legal requirements may be considered in constructing a fitting remedy. That is not quite correct. Legal standards establish the need for a remedy and constrain the remedies we may impose, but they are not the only permissible judicial considerations when constructing a proper remedy.[6] For example, one universally recognized redistricting criterion is communities of interest.[7] It is not a legal requirement, but it may nonetheless be an

---

not join contain language that would foreclose considerations that could be entirely proper in light of the equitable nature of a judicial remedy in redistricting. I address this below.

The dissent uses the term "majority/lead opinion" to reflect that not all paragraphs of the court's opinion reflect the opinion of four justices. While this is true, I use "majority opinion" for ease of use and to convey that the opinion is a majority except in the limited area of disagreement with the paragraphs I do not join.

[5] North Carolina v. Covington, 137 S. Ct. 1624, 1625 (2017) (per curiam) ("Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.'" (quoting Reynolds v. Sims, 377 U.S. 533, 585 (1964))); New York v. Cathedral Acad., 434 U.S. 125, 129 (1977) ("[I]n constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." (quoting another source)).

[6] Covington, 137 S. Ct. at 1625 (explaining that a court in a redistricting action "must undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified" and noting "there is much for a court to weigh" (quoting another source)).

[7] See Abrams v. Johnson, 521 U.S. 74, 99-100 (1997).

2

appropriate, useful, and neutral factor to weigh.[8]  Suppose we receive multiple proposed maps that comply with all relevant legal requirements, and that have equally compelling arguments for why the proposed map most aligns with current district boundaries.  In that circumstance, we still must exercise judgment to choose the best alternative.  Considering communities of interest (or other traditional redistricting criteria) may assist us in doing so.[9]  In other words, while a remedy must be tailored to curing legal violations, a court is not necessarily limited to considering legal rights and requirements alone when formulating a remedy.

¶84  This does not mean our remedial powers are without guardrails.[10]  And this is where the dissent errs.  The dissent argues we can take over the responsibility of the legislature entirely, discard policy judgments we don't like, and craft a new law from scratch consistent with our own policy concerns.

---

[8] Id. (noting with approval that a federal district court properly considered traditional redistricting criteria "includ[ing] maintaining core districts and communities of interest" when adopting a redistricting plan).

[9] Another example of a traditional and neutral redistricting criterion that may assist us, but does not implicate a legal right per se, is the goal of minimizing the number of voters who must wait six years between voting for their state senator. See Prosser v. Elections Bd., 793 F. Supp. 859, 864 (W.D. Wis. 1992).

[10] Schroeder v. Richardson, 101 Wis. 529, 531, 78 N.W. 178 (1899) ("[W]hile the power of a court of equity is quite broad where a remedy is called for and legal remedies do not meet the situation, it does not extend so far as to clothe the court with power to substitute judicial notions of justice for the written law.").

3

The reader should look past pleas for fairness and see this for what it is: a claim of dangerously broad judicial power to fashion state policy. According to the dissent, this court should simply ignore the law on the books——one the dissent makes clear it is not fond of——and draft a new one more to its liking.

¶85 The majority opinion aptly explains that our judicial role forecloses this; our remedial powers are not so unbounded.[11] It is appropriate for us to start with the laws currently on the books because they were passed in accordance with the constitutional process and reflect the policy choices the people made through their elected representatives.[12] Our task is therefore rightly focused on making only necessary modifications to accord with legal requirements.[13] A least-change approach is the most consistent, neutral, and appropriate use of our limited

---

[11] Whitcomb v. Chavis, 403 U.S. 124, 161 (1971) ("The remedial powers of an equity court must be adequate to the task, but they are not unlimited.").

[12] Laws do not become any less authoritative simply because newly-elected politicians disapprove of them. This court has no license to ignore laws based on our own personal policy disagreements or those of today's elected officials. The law changes by legislation, not by elections. See Vos, 393 Wis. 2d 38, ¶1.

[13] It appears that we also used the pre-existing statutory maps as our starting point in State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 128 N.W.2d 16 (1964). While we did not expressly adopt a least-change approach, the similarities between the remedial maps and the pre-existing statutory maps are striking. For example, of the 33 senate districts the court drew, 31 consisted of some or all of the same counties as the parallel predecessor districts. Compare Reynolds, 23 Wis. 2d at 617-18 with Wis. Stat. § 4.02 (1963-64). In contrast, only two districts——the 28th and the 31st——contained none of the same counties as they did under the prior maps. Id.

4

judicial power to remedy the constitutional violations in this case.[14]

¶86  We asked the parties to brief whether we should use a least-change approach, and if not, what approach we should use. The main alternative we received[15] was an entreaty to use this as an opportunity to rearrange district boundaries with the goal of reversing what the dissent calls "an obsolete partisan agenda."[16] As the majority opinion explains, the Wisconsin Constitution does not preclude the legislature from drawing districts with partisan interests in mind.[17]  In reality, we are being asked to make a political judgment cloaked in the veneer of neutrality. Namely, we are being asked to conclude that the current maps are likely to result in the election of too many representatives of one party, so we should affirmatively and aggressively redesign maps that are likely to result in the election of more members of a different political party.  The petition here——that we should use our equitable authority to reallocate political power

---

[14] The legislature, on the other hand, may decide for itself whether to defer to prior maps when enacting new districts into law.  The Wisconsin Constitution gives the legislature wide discretion to draft new maps from scratch based on the policy considerations it chooses. Wis. Const. art. IV, §§ 1, 3.

[15] The Legislature suggested we start with their proposed maps.  But those maps, if not enacted into law, are mere proposals deserving no special weight.

[16] Dissent, ¶114.

[17] The majority opinion concludes a claim for partisan gerrymandering is neither cognizable nor justiciable under the Wisconsin Constitution.  I agree and join the majority's holdings and analysis explaining why this is so.

in Wisconsin——is not a neutral undertaking. It stretches far beyond a proper, focused, and impartial exercise of our limited judicial power.

¶87 With this in view, parties are invited to submit congressional and state legislative maps that comply with all relevant legal requirements, and that endeavor to minimize deviation from existing law.[18] Parties should explain in their proposals why their maps comply with the law, and how their maps are the most consistent with existing boundaries. Parties should not present arguments regarding the partisan makeup of proposed districts. While other, traditional redistricting criteria may prove helpful and may be discussed, our primary concern is modifying only what we must to ensure the 2022 elections are conducted under districts that comply with all relevant state and federal laws.

---

[18] The Wisconsin Constitution explicitly requires the legislature to draw new state assembly and state senate districts after each census. Wis. Const. art. IV, § 3. This section does not refer to congressional districts. The parties dispute whether other provisions of the Wisconsin Constitution have anything to say about congressional districts. Regardless of the answer to that question, we have explained that "congressional reapportionment and state legislative redistricting are primarily state, not federal, prerogatives," and that "the United States Constitution and principles of federalism and comity dictate that the states' role is primary." Jensen, 249 Wis. 2d 706, ¶5. Where judicial action is necessary, this includes the primary role of state supreme courts. Id., ¶11. Accordingly, it is fitting for us to address congressional malapportionment claims as well, whether under state or federal law.

¶88 REBECCA FRANK DALLET, J. (*dissenting*). Redistricting is an "inherently political and legislative——not judicial——task," even when judges do it. See Jensen v. Wis. Elections Bd., 2002 WI 13, ¶10, 249 Wis. 2d 706, 639 N.W.2d 537 (per curiam). That is one reason why I said that the federal courts, comprised of judges insulated from partisan politics by lifetime appointments, are best suited to handle redistricting cases. See Johnson v. WEC, No. 2021AP1450-OA, unpublished order, at 15-16 (Wis. Sept. 22, 2021) (Dallet, J., dissenting). But now that we have stepped out of our traditional judicial role and into the "the political thicket" of redistricting, it is vital that this court remain neutral and nonpartisan. See Evenwel v. Abbott, 136 S. Ct. 1120, 1123 (2016). The majority[1] all but guarantees that we cannot. First, the majority adopts 2011's "sharply partisan" maps as the template for its "least-change" approach. See Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840, 844 (E.D. Wis. 2012). And second, it effectively insulates future maps from being challenged as extreme partisan gerrymanders. The upshot of those two decisions, neither of which is politically neutral, is to elevate outdated partisan choices over neutral redistricting criteria. That outcome has potentially devastating consequences for representative government in Wisconsin. I therefore dissent.

---

[1] I refer to Justice Rebecca Grassl Bradley's opinion as the "majority/lead opinion," because a majority of the court does not join it in its entirety. I refer to the "majority" only when discussing conclusions in the majority/lead opinion that garnered four votes.

¶89 The majority/lead opinion's adoption of a "least-change" approach to evaluating or crafting remedial maps does not "remov[e] us from the political fray and ensur[e] we act as judges rather than political actors." Majority/lead op., ¶77. It does the opposite, inserting the court directly into politics by ratifying outdated partisan political choices. In effect, a least-change approach that starts with the 2011 maps nullifies voters' electoral decisions since then. In that way, adopting a least-change approach is an inherently political choice. Try as it might, the majority is fooling no one by proclaiming its decision is neutral and apolitical.

¶90 Although no court in Wisconsin, state or federal, has ever adopted a least-change approach, the majority/lead opinion would have you believe that other jurisdictions commonly use such an approach when starting from legislatively drawn maps. But the cases it cites provide virtually no support for this approach. One simply involves a state's supreme court approving the trial court's selection of a congressional map. Alexander v. Taylor, 51 P.3d 1204, 1211 (Okla. 2002). All but one of the remaining cases began with court-drawn maps or involved local maps drawn for county boards and commissions. See Below v. Gardner, 963 A.2d 785, 794 (N.H. 2002). The bottom line is that the least-change approach has no "general acceptance among reasonable jurists" when the court's starting point is a legislatively drawn map. See majority/lead op., ¶73.

¶91 To be sure, there may be limited circumstances in which a least-change approach is appropriate. For example, when

a court is redrawing maps based on a prior court-drawn plan, it may make sense to make fewer changes since the existing maps should already reflect neutral redistricting principles. See, e.g., Hippert v. Ritchie, 813 N.W.2d 374, 380 (Minn. Special Redistricting Panel 2012) (explaining that the panel utilizes a least-change strategy "where feasible"); see also Zachman v. Kiffmeyer, No. C0-01-160, unpublished order, at 6 (Minn. Special Redistricting Panel Mar. 19, 2002) (adopting the plan that the Hippert court used as its template). Another situation where minimizing changes may be appropriate is when a court finds localized problems with a plan validly enacted through the political process. See Baldus, 849 F. Supp. 2d at 859-60 (E.D. Wis. 2012) (holding that two Milwaukee-area assembly districts violated the Voting Rights Act, but emphasizing that "the re-drawing of lines for [those districts] must occur within the combined outer boundaries of those two districts" to avoid disrupting the otherwise valid state map).

¶92 Here, however, we are dealing with neither of those situations. We are adopting statewide maps to replace a 2011 plan that the parties all agree is now unconstitutional. More to the point, however, the 2011 map was enacted using a "sharply partisan methodology" by a legislature no longer in power and a governor who the voters have since rejected. See id. at 844, 851 (adding that it was "almost laughable" that anyone would assert that those maps "were not influenced by partisan factors"). The partisan character of the 2011 maps is evident both in the process by which they were drawn——"under a cloak of

3

secrecy," totally excluding the minority political party[2]——and in their departure from neutral traditional redistricting criteria. See id. at 850 (explaining that the court shared "in many respects" plaintiffs' expert's concerns that the 2011 maps contained "excessive shifts in population, disregard for core district populations, arbitrary partisan motivations related to compactness, and unnecessary disenfranchisement").

¶93 It is one thing for the current legislature to entrench a past legislature's partisan choices for another

---

[2] At the outset of the 2011 redistricting process, "the Republican legislative leadership announced to members of the Democratic minority that the Republicans would be provided unlimited funds to hire counsel and consultants" to assist in redistricting, while "Democrats . . . would not receive any funding." Baldus, 849 F. Supp. 2d at 844-45. One of the drafters met with "every single Republican member of the State Assembly," but "[h]e did not meet with any Democrats." Id. at 845. Before each meeting, the participants were required to sign confidentiality agreements. Id. Another drafter held meetings "with the Republican members [of Congress]," who "expressed their desire to draw districts that would maximize the chances for Republicans to be elected." Id. at 846. In addition to keeping the plan secret from Democratic legislators, "[e]very effort was made to keep this work out of the public eye." Id. at 845.

decade.[3] It is another thing entirely for this court to do the same. For starters, the least-change approach is not the "neutral standard" the majority/lead opinion portrays it as. Rather, applying that approach to 2011's maps affirmatively perpetuates the partisan agenda of politicians no longer in power. It doesn't matter which political party benefits from the 2011 maps, only that we cannot start with them and maintain judicial neutrality. Moreover, a least-change approach risks entrenching 2011's partisan agenda in future redistricting cycles. If the party that benefits from the maps adopted in this case controls only the legislature for the next redistricting cycle, it has every incentive to ensure an impasse. After all, an impasse will result in the court changing the maps as little as possible——thus preserving that party's hold on power. The point is, the least-change approach is anything but a "neutral standard." Majority/lead op., ¶76.

---

[3] The majority/lead opinion hints that a least-change approach is appropriate because the 2011 maps were "codified as statutes, without a sunset provision, and have not been supplanted by new law." Majority/lead op., ¶72 n.8. But both the Wisconsin and U.S. Constitutions require that all maps be redrawn every ten years to account for population shifts since the prior census. See Wis. Const. art. IV, § 3 (requiring the legislature to "apportion and district anew the members of the senate and assembly" in the first session after each census); see also Reynolds v. Sims, 377 U.S. 533 (1964); Baker v. Carr, 369 U.S. 186 (1962). These are the sunset provisions. In this respect, the 2011 maps are unlike an ordinary unconstitutional statute, since they were enacted without any expectation of longevity. Indeed, at this point they are a practical nullity. Accordingly, the majority/lead opinion's comparisons to the typical remedies when a court finds a statute unconstitutional are inapt. See id., ¶¶67, 72 & n.8. And the fact that the maps have "not been supplanted by new law," id., ¶72 n.8, is precisely the reason why the court is redistricting at all. It is hardly a reason to treat the prior maps as a valid template.

¶94 True neutrality could be achieved by instead adhering to the neutral factors supplied by the state and federal constitutions, the Voting Rights Act, and traditional redistricting criteria. The population equality (i.e., "one person, one vote") principles in the state and federal constitutions and the federal Voting Rights Act, 52 U.S.C. § 10301(a), are universally acknowledged as politically neutral and central to any redistricting plan. Likewise for the remaining requirements of the Wisconsin Constitution, compactness, contiguity, and respect for political subdivision boundaries. Wis. Const. art. IV, §§ 3, 4. In addition to these constitutional and statutory baselines, neutral factors include other "traditional redistricting criteria" such as compactness,[4] preserving communities of interest, and minimizing "senate disenfranchisement."[5] E.g., Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002).

¶95 The traditional redistricting criteria, however, are glaringly absent from the majority/lead opinion. A charitable

---

[4] Unlike the Wisconsin Constitution, the U.S. Constitution does not impose a compactness requirement on congressional districts. Nonetheless, compactness is one of the traditional redistricting criteria applied by courts drawing congressional maps or reviewing legislatively-drawn ones. See, e.g., Baldus, 849 F. Supp. 2d at 850; Prosser v. Elections Bd., 793 F. Supp. 859, 863 (W.D. Wis. 1992).

[5] Senate disenfranchisement occurs when a voter is shifted from an odd-numbered senate district (which votes only in midterm election years) to an even-numbered senate district (which votes only in presidential election years), thereby delaying for two years the voter's ability to vote for her state senator. See Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002).

6

read of the majority/lead opinion is that whatever factors it doesn't discuss——preserving communities of interest and minimizing senate disenfranchisement, for example——are sufficiently baked into the 2011 maps such that we can simply rebalance the populations of existing districts and call it a day. But, as mentioned previously, there is good reason to doubt that the 2011 maps meaningfully balanced any of the traditional redistricting criteria.

¶96 For one thing, while the 2011 maps were attacked in federal court for failing to satisfy some of the traditional redistricting criteria, the federal court examined those criteria only to the extent needed to justify constitutionally suspect population deviations between districts. See Baldus, 849 F. Supp. 2d at 849-52. As a result, the federal court made no finding, for example, that the prior maps adequately accounted for communities of interest. In fact, the federal court noted that it shared many of plaintiffs' expert's concerns that the maps did not do so. See id. at 851.

¶97 For another thing, even if the 2011 maps reflected the traditional redistricting criteria when they were adopted, we cannot assume that they still reflect those criteria today. Population shifts over the last ten years may have expanded or altered existing communities of interest, and various ways of equalizing the populations of state legislative districts may result in unnecessary senate disenfranchisement. This is why even when other courts use a least-change approach, they acknowledge that traditional redistricting criteria might still require more substantial changes. See, e.g., Alexander, 51 P.3d

7

at 1211 (starting with the prior legislatively enacted map but considering "[w]idely recognized neutral redistricting criteria" including core retention, communities of interest, and avoiding incumbent pairing); Hippert, 813 N.W.2d at 380-82, 385-86 (using "a least-change strategy where feasible" alongside considerations of communities of interest and incumbent residences).

¶98 In this case we are adopting new maps, not reviewing legislatively enacted ones. We should therefore ensure that the maps we adopt are the "best that c[an] be managed" under all relevant criteria, especially since we know that there is no single dispositive factor in crafting districts. See Prosser v. Elections Bd., 793 F. Supp. 859, 863 (W.D. Wis. 1992); see also Baldus, 849 F. Supp. 2d at 850 (explaining that "factors like homogeneity of needs and interests, compactness, contiguity, and avoidance of breaking up counties, towns, villages, wards, and neighborhoods," not just population equality, "are all necessary to achieve" a representative democracy). Adopting the best maps possible based on all the relevant criteria protects our neutrality and ensures that the resulting districts foster a representative democracy. That is, in part, why the last three federal courts to draw Wisconsin's districts took a similar tack. See Baumgart, 2002 WL 34127471, at *2 ("The reapportionment of state legislative districts requires balancing of several disparate goals."); Prosser, 793 F. Supp. at 865 ("The issue for us is therefore remedy: not, [i]s some enacted plan constitutional? But, [w]hat plan shall we as a court of equity promulgate in order to rectify the admitted

8

constitutional violation? What is the best plan?"); Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630, 637 (E.D. Wis. 1982) (discussing the traditional redistricting criteria before adopting the court's own plan, without deference to the last set of maps adopted by the legislature). Along the way, we may have to make fewer changes in some places, and more changes in others. See Robert Yablon, Gerrylaundering, 97 N.Y.U. L. Rev. (forthcoming 2022) (explaining that in redistricting "we should not reflexively embrace the past for the sake of stability," but "we also should not reflexively embrace change above all else"). But resorting to a least-change approach does not help us balance the relevant factors.

¶99 More concerning than its silence regarding the traditional redistricting criteria is the possibility that the majority/lead opinion will prioritize its atextual least-change approach over the text of the Wisconsin Constitution. The Wisconsin Constitution imposes several substantive requirements on assembly districts, including that they be in "as compact form as practicable." Wis. Const. art. IV, § 4. The majority/lead opinion's reasoning suggests that, despite that constitutional directive and even if a more compact set of population-equalizing assembly maps is "practicable," the court is free to adopt a less compact set of maps simply because they make fewer changes to the 2011 plan. That cannot be right. The least-change principle is found nowhere in the Wisconsin or U.S. Constitutions. Constitutionally mandated criteria do not take a back seat to extra-constitutional methods like least-change. See Yablon, supra (explaining that nothing would "license the

9

legislature to adopt a map that subordinates the[] criteria [of the Wisconsin Constitution] to an extra-legal preference" for minimal changes to the previous maps).

¶100 Likewise, the text of the Wisconsin Constitution provides no support for the majority's hierarchical distinctions between its various criteria. Nowhere does the Constitution relegate to "secondary importance" the requirements of compactness, contiguity, and respect for political subdivision boundaries found in Article IV, § 4. Contra majority/lead op., ¶34 (citing Wis. State AFL-CIO, 543 F. Supp. at 635). And the majority offers no legitimate explanation for why some constitutional requirements are more important than others. The source it cites for this supposed primary/secondary distinction——Wisconsin State AFL-CIO——is of no help because that case found the distinction in an Illinois case citing the Illinois Constitution. See Wis. Stat. AFL-CIO, 543 F. Supp. at 635 (citing People ex rel. Scott v. Grivetti, 277 N.E.2d 881 (Ill. 1971)). Just as we cannot allow an atextual approach, such as least-change, to supersede the Constitution's text, we cannot pretend that some constitutional provisions are more important than others.

¶101 Finally, the majority fails to flesh out exactly what a least-change approach entails, thus leaving the parties with little actual guidance. What exactly, should the parties change the least? Does "least change" refer to the fewest changes to districts' boundary lines? The fewest number of people moved from one district to the next? Moreover, based on recent population shifts, what is the feasibility of a least-change

10

approach? Hippert, 813 N.W.2d at 381 ("[P]opulation shifts within the state, however, sometimes [render] a least-change approach . . . not feasible."). For example, Dane County has gained more than 73,000 residents since the last census——more than the optimal population of an entire assembly district.[6] Meanwhile, Milwaukee County and many of the state's rural areas have seen slow growth or outright declines in population.[7] These population shifts suggest that the 2011 district lines, particularly on a legislative level, may not provide a very useful template for crafting a remedial plan.

II

¶102 In an unnecessary and sweeping overreach, the majority effectively insulates future maps from constitutional attack by holding that excessive partisan gerrymandering claims are not viable under the Wisconsin Constitution. It gets there by answering a constitutional question that we never asked, that the parties did not brief, and that is immaterial to this case.[8] The majority seems to think that, because it fails to "find a right to partisan fairness in . . . the Wisconsin Constitution," the court cannot consider, for any reason, the partisan effects of remedial maps. Majority/lead op., ¶53. But there is no

---

[6] See https://www.census.gov/quickfacts/fact/table/milwaukee countywisconsin,danecountywisconsin,marinettecountywisconsin/PST 045219.

[7] See id.

[8] The question we actually asked was whether the "partisan makeup of districts [is] a valid factor for us to consider in evaluating or creating new maps." Johnson v. WEC, No. 2021AP1450-OA, unpublished order, at 2 (Wis. Oct. 14, 2021).

11

logical connection between these conclusions. In fact, willfully blinding the court to the partisan makeup of districts increases the risk that we will adopt a partisan gerrymander.

A

¶103 The majority's gratuitous discussion of whether claims of extreme partisan gerrymandering are cognizable under the Wisconsin Constitution starts with a flawed reading of the United States Supreme Court's decision in Rucho v. Common Cause, 139 S. Ct. 2484 (2019). There, the Court held that excessive partisan-gerrymandering claims were not justiciable under the federal constitution because there were no judicially manageable standards by which federal courts could determine that gerrymandering had gone too far. Id. at 2498-2502 (clarifying that the Court does "not condone excessive partisan gerrymandering"). The Court observed, however, that this remained an open question under state constitutions. Id. at 2507-08. It should be obvious that here, because we have no partisan gerrymandering claim before us, Rucho is irrelevant. Several parties have urged us not to adopt a map tantamount to a partisan gerrymander, and some have pointed out that Wisconsin's current legislative and congressional districts are the result

12

of a "sharply partisan methodology."[9] See Baldus, 849 F. Supp. 2d at 844. But nobody argues that we should strike down any existing map on the basis that it is an extreme partisan gerrymander. Without an excessive partisan-gerrymandering claim before us, there is no reason for the majority to issue an advisory opinion about whether such claims are cognizable under the Wisconsin Constitution.

¶104 That said, even if someone had brought such a claim, the majority is wrong that determining when partisan gerrymandering has gone too far is a non-justiciable political question under the Wisconsin Constitution. It is not, as the majority claims, "obvious[ly]" impossible to develop judicially manageable standards for judging when partisan gerrymandering is excessive. Indeed, other state courts have done it. See League of Women Voters of Pa. v. Pennsylvania, 178 A.3d 737, 814, 821 (Pa. 2018) (holding that claims of extreme partisan gerrymandering are cognizable under the Pennsylvania Constitution and striking down the state's congressional map on that basis); Common Cause v. Lewis, No. 18CVS014001, 2019 WL 4569584, at *2-3 (N.C. Super. Ct. Sept. 3, 2019) (striking down state legislative maps as "extreme partisan

---

[9] The majority mischaracterizes this argument as advocating a "proportional party representation" requirement. See majority/lead op., ¶¶42, 47. No party has suggested that the court should radically reform our system of government to ensure the political parties are represented in proportion to their percentage of the statewide vote. In fact, the only party that argues for a constitutional requirement that the court consider partisan metrics acknowledges that proportional representation by political party is unattainable given single-member districts and the political geography of Wisconsin.

13

gerrymandering"). And the federal courts had done it before Rucho. See, e.g., Ohio A. Philip Randolph Inst. v. Householder, 373 F. Supp. 3d 978, 1078 (S.D. Ohio 2019) (concluding that "workable standards, which contain limiting principles, exist so that courts can adjudicate [partisan] gerrymandering claims just as they have adjudicated other types of gerrymandering claims"), vacated and remanded sub nom. Chabot v. Ohio A. Philip Randolph Inst., 140 S. Ct. 102 (2019); League of Women Voters of Mich. v. Benson, 373 F. Supp. 3d 867, 911-12 (E.D. Mich. 2019) (explaining that "lower federal courts have formulated judicially-manageable standards for adjudicating partisan gerrymandering claims"), vacated and remanded sub nom. Chatfield v. League of Women Voters of Mich., 140 S. Ct. 429 (2019). There is no reason why we could not develop similar standards to judge such claims in Wisconsin.

¶105 In any case, there is no need for us to decide this question now. We have no claim of excessive partisan gerrymandering before us. We should wait until we do and then decide——with the benefit of full briefing from the parties—— whether our Constitution protects a practice that is "incompatible with democratic principles." See Ariz. State Legis. v. Ariz. Ind. Redistricting Comm'n, 135 S. Ct. 2652, 2658 (2015).

B

¶106 Although the majority's rejection of extreme partisan-gerrymandering claims has no effect on the outcome of this case, it likely has far-reaching consequences for future redistricting

14

cycles. Discarding a potential limitation on partisan gerrymandering gives future legislators and governors a green light to engage in a practice that robs the people of their most important power——to select their elected leaders. See The Federalist No. 37, at 4 (James Madison) ("The genius of republican liberty seems to demand on one side, not only that all power should be derived from the people, but that those [e]ntrusted with it should be kept in independence on the people.").

¶107 Extreme partisan gerrymandering strikes at the foundation of that power. Representative government demands "that the voters should choose their representatives, not the other way around." Ariz. State Legis., 135 S. Ct. at 2677 (internal quotation marks omitted). Extreme partisan gerrymandering turns that on its head. It allows a party in power to draw district lines that guarantee its hold on power for a decade or more, no matter what the voters choose.

¶108 No problem, the majority says, "[e]ven after the most severe partisan gerrymanders, citizens remain free" to run for office, express their views, and vote for the candidates of their choice. Majority/lead op., ¶60. But the problem with extreme partisan gerrymandering isn't that it literally denies people the right to vote or run for office. It's that extreme gerrymandering distorts the political process so thoroughly that those rights can become meaningless. No matter how warped the process becomes, post-Rucho, the federal courts cannot intervene. Now, the majority all but guarantees that we won't either.

15

C

¶109 The majority's misapplication of Rucho leads it to conflate how the court might analyze legislatively drawn maps with how it should select or draw remedial ones. That error is evident from the start, as the majority frames the analysis around the question of whether we "should judge maps for partisan fairness," regardless of who draws them. Majority/lead op., ¶39. But "who draws them" makes all the difference. There is a significant difference between second-guessing the partisan fairness of a map drawn by an inherently partisan legislature, which "would have the virtue of political legitimacy," and our task here, which is to "pick[] the [plan] (or devis[e] our own) most consistent with judicial neutrality." See Prosser, 793 F. Supp. at 867. We are not asked to determine if maps enacted by the legislature through the normal legislative process amount to an unconstitutional partisan gerrymander. Cf. Rucho, 139 S. Ct. at 2507. Rather, we are adopting maps because that process has failed. In doing so, we must act consistent with our role as a non-partisan institution and avoid choosing maps designed to benefit one political party over all others. See Prosser, 793 F. Supp. at 867. The people rightly expect courts to redistrict in neutral ways.

¶110 The majority claims that considering partisanship for any reason is inconsistent with judicial neutrality. That all-or-nothing position distorts the nuanced reality of the court's role in redistricting. Other courts' redistricting experience shows that partisanship is just another one of the many factors a court must balance when enacting remedial maps.

16

¶111 The last three courts to tackle redistricting in Wisconsin all considered partisan effects alongside other generally accepted neutral factors when evaluating and choosing remedial maps. See Baumgart, 2002 WL 34127471, at *3-4 (rejecting maps proposed by the parties on the grounds that they were drawn to preserve or obtain partisan advantage); Prosser, 793 F. Supp. at 867-68, 870-71 (analyzing the partisan effects of several proposals before ultimately adopting a court-drawn plan that was "the least partisan"); Wis. State AFL-CIO, 543 F. Supp. at 634. Those courts considered the partisan effects of their decisions not to enact their subjective view of what is politically fair but because courts, unlike legislatures, should not behave like political entities:

> Judges should not select a plan that seeks partisan advantage——that seeks to change the ground rules so that one party can do better than it would do under a plan drawn up by persons having no political agenda—— even if they would not be entitled to invalidate an enacted plan that did so.

Prosser, 793 F. Supp. at 867; see also Baumgart, 2002 WL 34127471, at *3 (following Prosser); Jensen, 249 Wis. 2d 706, ¶12 (quoting Prosser). The Indiana Supreme Court likewise declined to enact "a plan that represents one political party's ideas of how district boundaries should be drawn [because doing so] does not conform to the principle of judicial independence and neutrality." Peterson v. Borst, 786 N.E.2d 668, 675 (Ind. 2003).

¶112 Indeed, although it sounds contradictory, the only way for the court to avoid unintentionally selecting maps designed to benefit one political party over others is by considering the

17

maps' likely partisan effects. The United States Supreme Court has suggested as much, explaining that taking a "politically mindless approach" to redistricting may lead to "grossly gerrymandered results," "whether intended or not." Gaffney v. Cummings, 412 U.S. 735, 753 (1973). Refusing to consider partisan effects only increases the risk that the court will be used, intentionally or not, to achieve partisan ends. This is especially true when our starting point is 2011's indisputably partisan maps.

## III

¶113 I close with a lingering question that the majority/lead opinion surprisingly leaves unaddressed: Exactly what maps are we talking about——congressional and state legislative maps or only the latter? There is evidence in the majority/lead opinion to support both answers. On the one hand, the majority/lead opinion begins by discussing the legislature's duty under Article IV, § 3 of the Wisconsin Constitution "to apportion and district anew the members of the senate and assembly," and later explains that this requirement does not apply to congressional districts. See majority/lead op., ¶¶1, 13 & n.4. That suggests only state legislative maps are at play. On the other hand, the majority/lead opinion identifies redistricting principles applicable to congressional maps under the federal constitution, but without stating that it intends to draw new congressional maps. See id. ¶¶24-25. Similarly, the majority/lead opinion states at different times that it intends to remedy the "malapportionment" of "each legislative district,"

18

id., ¶4 (emphasis added), but also that "any judicial remedy" in this case will be confined "to making the minimum changes necessary in order to conform the existing congressional and state legislative redistricting plans to constitutional and statutory requirements." Id., ¶8 (emphasis added). At least two parties, the Hunter Plaintiffs and the Congressmen, have suggested that they intend to litigate what, if anything, the Wisconsin Constitution has to say about congressional redistricting, but so far the court has no motion or other briefing on that question. So it is unclear from the start what the majority/lead opinion is even addressing.

IV

¶114 The majority repeatedly protests that any approach other than its preferred one would undermine our non-partisan role and imperil the legitimacy and independence of the judiciary. But the neutral principles supplied by the U.S. and Wisconsin Constitutions, the Voting Rights Act, and the traditional redistricting criteria can preserve our independence while still guiding the parties and the court towards resolving this case. The majority deals a striking blow to representative government in Wisconsin by ignoring those neutral principles and committing the court to an approach that prioritizes an obsolete partisan agenda. I therefore dissent.

¶115 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this dissent.

19